# United States Court of Appeals for the Federal Circuit

05-5178


ACADIA TECHNOLOGY, INC.,
and
GLOBAL WIN TECHNOLOGY, LTD.,

Plaintiffs-Appellants

v.


UNITED STATES,

Defendant-Appellee.


Mattaniah Eytan, of Corte Madera, California, argued for plaintiffs-appellants.

Marla T. Conneely, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and Mark A. Melnick, Assistant Director. Of counsel was Marta Whearley, Office of Assistant Chief, U.S. Bureau of Customs and Border Protection, of San Francisco, California.

Brian F. Burke, Baker & McKenzie LLP, of Washington, DC, for amicus curiae. With him on the brief was Kristine E. Pirnia. Of counsel on the brief were Nancie G. Marzulla and Roger J. Marzulla, Defenders of Property Rights, of Washington, DC.

Appealed from: United States Court of Federal Claims

Senior Judge Robert H. Hodges, Jr.

# United States Court of Appeals for the Federal Circuit

05-5178

ACADIA TECHNOLOGY, INC.,
and
GLOBAL WIN TECHNOLOGY, LTD.,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:  August 8, 2006

_____

Before BRYSON, Circuit Judge, ARCHER, Senior Circuit Judge, and GAJARSA, Circuit Judge.

BRYSON, Circuit Judge.

The appellants, importers of computer parts, contend that their imported goods were taken without just compensation, in violation of the Fifth Amendment, when the government seized their goods upon importation and did not return them for a period of more than four years.  The Court of Federal Claims held that the appellants failed to state a claim on which relief could be granted.  Acadia Tech., Inc. v. United States, 65 Fed. Cl. 425 (2005).  We affirm.

I

Appellants Acadia Technology, Inc., and Global Win Technology, Ltd., (collectively, "Acadia") own the property at issue in this appeal, 20,923 cooling fans for computer central processing units.  Acadia sought to import those goods into the United States in three shipments in October 1997 and February 1998.

Underwriters Laboratories ("UL") is a testing laboratory that examines and tests various products for compliance with safety standards.  If UL finds that a manufacturer's goods comply with applicable standards, UL authorizes the manufacturer to affix UL's certification marks to its goods.  The "reverse UR" is a certification mark that UL issues for electrical components of multi-component devices (such as computer cooling fans).

Section 42 of the Lanham Act, 15 U.S.C. § 1124, forbids importation of merchandise "which shall copy or simulate a [registered] trademark."  Section 526(e) of the Tariff Act of 1930, 19 U.S.C. § 1526(e), provides that any merchandise bearing a counterfeit mark (within the meaning of 15 U.S.C. § 1127) that is imported into the United States in violation of 15 U.S.C. § 1124 "shall be seized and, in the absence of the written consent of the trademark owner, forfeited for violations of the customs laws."

In October 1997, U.S. Customs and Border Protection ("Customs"), acting pursuant to section 526(e) of the Tariff Act, detained a shipment of Acadia's cooling fans that bore the "reverse UR" mark.  After receiving a letter from UL on October 16, 1997, stating that UL believed the use of the marks to be unauthorized and counterfeit, Customs seized the fans.  On February 2 and 3, 1998, Customs seized two more shipments of Acadia's cooling fans, again after receiving letters from UL stating that UL believed that the use of the "reverse UR" mark on the fans was unauthorized and

counterfeit. According to the complaint, the three shipments of cooling fans had a total value of approximately $125,130 when they were seized.

After Customs seized the fans, it notified Acadia of the seizure and advised Acadia that it would initiate summary forfeiture proceedings unless Acadia filed a claim of ownership. In letters dated April 16, 1998, and July 29, 1998, Acadia requested that Customs terminate the summary forfeiture proceedings. Acadia submitted forms in which it requested that the matter be transferred to the Department of Justice for the institution of a judicial civil forfeiture action.

The matter was transferred to the Department of Justice in accordance with Acadia's request, but a forfeiture complaint was not promptly filed. On October 8, 2002, after a period of more than four years, the Department of Justice filed a civil forfeiture action in the United States District Court for the Northern District of California, seeking forfeiture of all three of Acadia's shipments. A year later, on October 15, 2003, the district court entered a stipulation and order of dismissal. Under the terms of the order, the forfeiture action was dismissed. The stipulated dismissal provided that each party was to bear its own costs. The fans were thereafter returned to Acadia. At that point, according to Acadia's complaint, the fans had become obsolete and their only value was as scrap, for which purpose they were worth only about $41,000.

After the dismissal of the forfeiture action, Acadia filed this action in the Court of Federal Claims, claiming the right to recover the difference between the value of the fans at the time they were seized and their value when they were returned. The government moved to dismiss the complaint for lack of subject matter jurisdiction and for failure to state a claim upon which relief could be granted. In its opposition to the

government's motion to dismiss, Acadia conceded that the Court of Federal Claims lacked jurisdiction over two of its claims, but it argued that the court had jurisdiction over its claim that the government's actions violated the Takings Clause of the Fifth Amendment and that Acadia was entitled to recover the loss in the value of the fans as just compensation for the taking. The Court of Federal Claims granted the government's motion to dismiss the takings claim for failure to state a claim, and Acadia now appeals.

II

Acadia argues that the government's actions constituted a taking for two independent reasons. First, Acadia argues that the seizure of its goods was a taking because it was not authorized by the statute under which Customs seized Acadia's goods. Second, Acadia argues that the government's delay of several years in initiating forfeiture proceedings was unreasonable and therefore constituted a taking regardless of whether the initial seizure was lawful.

A

With respect to the lawfulness of the original seizure, Acadia contends that 19 U.S.C. § 1526(e), the statute on which Customs relied to seize the cooling fans, applies only to counterfeit trademarks, and not to false certification marks such as the "reverse UR" mark at issue in this case. Section 1526(e) provides that any merchandise "bearing a counterfeit mark (within the meaning of section 1127 of title 15) imported into the United States in violation of the provisions of section 1124 of title 15, shall be seized and . . . forfeited for violations of the customs laws." 19 U.S.C. § 1526(e). Section 1127 of title 15 defines a "mark" to include "any trademark, service mark, collective mark, or

certification mark," and it defines "counterfeit" as "a spurious mark, which is identical with, or substantially indistinguishable from, a registered mark."  15 U.S.C. § 1127. Section 1124 of title 15 provides, in pertinent part, that "no article of imported merchandise . . . which shall copy or simulate a trademark registered in accordance with the provisions of [the Lanham] Act . . . shall be admitted to entry."  15 U.S.C. § 1124.  Acadia points to the use of the term "trademark" in section 1124 and argues that section 1124 (and thus the seizure and forfeiture provisions of section 1526(e)) apply to trademarks, but not to certification marks.  For that reason, Acadia argues, the seizure of Acadia's cooling fans was unlawful and therefore compensable as a taking.

Both the trial court in this case and the United States District Court for the Northern District of California in United States v. 10,510 Packaged Computer Towers, 152 F. Supp. 2d 1189, 1194-97 (N.D. Cal. 2001), have disagreed with Acadia's construction of section 1526(e) and have held that the statute applies to counterfeit certification marks as well as counterfeit trademarks.  This court has never addressed that question, and it is unnecessary for us to do so here.  For purposes of determining whether there has been a taking of Acadia's property without just compensation, it is unnecessary to determine whether section 1526(e) applies to the particular goods at issue in this case.  That is because a takings claim is separate from a challenge to the lawfulness of the government's conduct:  a taking does not result simply because the government acted unlawfully, nor does a takings claim fail simply because the government's conduct is subject to challenge as unlawful.

As we explained in Rith Energy, Inc. v. United States, 247 F.3d 1355 (Fed. Cir. 2001), "an uncompensated taking and an unlawful government action constitute 'two

separate wrongs that give rise to two separate causes of action.'" Id. at 1365 (quoting Del-Rio Drilling Programs, Inc. v. United States, 146 F.3d 1358, 1364 (Fed. Cir. 1998)). "[A] property owner is free either to sue in district court for asserted improprieties committed in the course of the challenged action or to sue for an uncompensated taking in the Court of Federal Claims." Id. As such:

> [I]n a takings case we assume that the underlying action was lawful and we decide only whether the governmental action in question constituted a taking for which compensation must be paid. [The appellant's] complaints about the wrongfulness of the [government action] are therefore not properly presented in the context of its takings claim. The only question before us is whether [the appellant] was entitled to be compensated for the effects of that action.

Rith Energy, Inc. v. United States, 270 F.3d 1347, 1352-53 (Fed. Cir. 2001) (on petition for rehearing); see also Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 543 (2005); Lion Raisins, Inc. v. United States, 416 F.3d 1356, 1369 (Fed. Cir. 2005) ("We have made clear that a claim premised on a regulatory violation does not state a claim for a taking."); John Corp. v. City of Houston, 214 F.3d 573, 579 n.9 (5th Cir. 2000) (citing cases for the proposition that "the Takings Clause presupposes legitimate government action"); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997) (Tucker Act does not create jurisdiction in the Court of Federal Claims for a party contesting the propriety of a seizure); Tabb Lakes, Ltd. v. United States, 10 F.3d 796, 802 (Fed. Cir. 1993) ("[The] claimant must concede the validity of the government action which is the basis of the taking claim to bring suit under the Tucker Act."); Fla. Rock Indus., Inc. v. United States, 791 F.2d 893, 905 (Fed. Cir. 1986). Acadia's assertion that Customs' actions ran afoul of the Customs statutes therefore does not form the basis for a legal claim under the Takings Clause of the Fifth Amendment. See Lion Raisins, 416 F.3d at

416 ("Because Lion's takings claim was premised on the allegations that the [government agency] violated the statute and regulations, the Court of Federal Claims properly dismissed the complaint."). For takings purposes, we therefore must assume the government conduct at issue in this case was not unlawful.

Assuming that Customs' seizure of Acadia's goods was lawful, the question presented by Acadia's first argument becomes whether the seizure of property to enforce an intellectual property provision of the Tariff Act is the sort of "public use" of private property for which the Takings Clause of the Fifth Amendment requires compensation. The case law makes clear that it is not.

When property has been seized pursuant to the criminal laws or subjected to in rem forfeiture proceedings, such deprivations are not "takings" for which the owner is entitled to compensation. Bennis v. Michigan, 516 U.S. 442, 452-53 (1996); Calero-Toledo v. Pearson Yacht Leasing Co., 416 U.S. 663, 680 (1974); Van Oster v. Kansas, 272 U.S. 465, 468 (1926). The same rule applies even if the property is seized as evidence in a criminal investigation or as the suspected instrumentality of a crime, but is ultimately returned to the owner either because the government does not pursue forfeiture proceedings or because the owner prevails in a forfeiture action. See, e.g., United States v. $7,990.00 in U.S. Currency, 170 F.3d 843, 845-46 (8th Cir. 1999) ("[T]he government's temporary possession of seized property that it ultimately returned to a forfeiture claimant . . . is not a 'taking' for Fifth Amendment purposes."); United States v. One 1979 Cadillac Coupe de Ville, 833 F.2d 994, 1000 (Fed. Cir. 1987); United States v. Various Gambling Devices, 478 F.2d 1194, 1198 (5th Cir. 1973); Seay

v. United States, 61 Fed. Cl. 32, 35 (2004); Crocker v. United States, 37 Fed. Cl. 191, 195-96, aff'd, 125 F.3d 1475 (Fed. Cir. 1997).

In One 1979 Cadillac, the government seized the claimant's car and brought a forfeiture action in district court, alleging that the car had been used in a narcotics transaction. The jury ruled in favor of the owner of the car, and the district court ordered the government to pay $4,050 in damages, which represented the decrease in value over the 30 months between the initial seizure and the court's ruling. 833 F.2d at 996. We reversed, holding that the government's seizure and retention of the property did not constitute a taking. Id. at 1000-01. Similarly, in Seay, the Court of Federal Claims held that the government did not have a duty to compensate the claimant where the government seized property and returned it to the claimants in a damaged condition nearly six years after the seizure. 61 Fed. Cl. at 35. The government's seizure, retention, and damaging of the property did not give rise to an actionable claim for a taking, the court reasoned, because "items properly seized by the government under its police power are not seized for 'public use' within the meaning of the Fifth Amendment." Id.

Although there is no underlying allegation of criminal conduct in the present case as there was in One 1979 Cadillac and Seay, there is no reason to treat civil forfeitures differently for purposes of takings analysis simply because Congress has directed that the forfeitures be enforced through civil rather than criminal proceedings. A Customs seizure of goods suspected of bearing counterfeit marks is a classic example of the government's exercise of the police power to condemn contraband or noxious goods, an exercise that has not been regarded as a taking for public use for which

05-5178                                    8

compensation must be paid. See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1027-28 (1992) ("[I]n the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless."); Andrus v. Allard, 444 U.S. 51, 66-67 (1979) ("Regulations that bar trade in certain goods have been upheld against claims of unconstitutional taking."); $7,990.00 in U.S. Currency, 170 F.3d at 845 ("[T]he forfeiture of contraband is an exercise of the government's police power, not its eminent domain power."); see also Lee v. City of Chicago, 330 F.3d 456, 476 (7th Cir. 2003) (D. Wood, J., concurring) ("[I]n rem forfeitures of property used for illicit purposes are non-compensable exercises of the government's police power."). While it is insufficient to avoid the burdens imposed by the Takings Clause simply to invoke the "police powers" of the state, regardless of the respective benefits to the public and burdens on the property owner, the prohibition on importing goods bearing counterfeit marks that misrepresent their quality and safety is the kind of exercise of the police power that has repeatedly been treated as legitimate even in the absence of compensation to the owners of the imported property. See generally Calero-Toledo, 416 U.S. at 680 (statutory forfeiture scheme authorizing forfeiture of a vessel used to transport marijuana does not violate the Takings Clause); Miller v. Schoene, 276 U.S. 272, 279-80 (1928) (state-ordered destruction of red cedar trees, hosts to cedar rust, which attacks apple trees held not to be a taking for which compensation is required: "[W]here the public interest is involved, preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which

affects property."); <u>Mugler v. Kansas</u>, 123 U.S. 623 (1887) (state law outlawing manufacture and sale of alcoholic beverages did not constitute a taking of private property for public use: "A prohibition simply upon the use of property for purposes that are declared, by valid legislation, to be injurious to the health, morals, or safety of the community, cannot, in any just sense, be deemed a taking or an appropriation of property for the public benefit.").[1]

B

Acadia's second argument is that, regardless of the legitimacy of the initial seizures of the cooling fans, the delay in returning the fans was unreasonable and the unreasonable delay resulted in a compensable taking. We reject that argument as well. As in the case of the challenge to the initial seizures, the flaw in Acadia's argument regarding unreasonable governmental delay is that it is predicated on the unlawfulness of the delay. Acadia acknowledged at oral argument that if the delay in this case were considered reasonable under the circumstances, there would be no taking requiring compensation under the Takings Clause. Under the authorities cited above, such as

---

[1]     In <u>Shelden v. United States</u>, 7 F.3d 1022 (Fed. Cir. 1993), this court held that an innocent owner of a mortgage interest in property that was subject to a criminal forfeiture could pursue a takings claim. As we subsequently made clear in <u>Vereda, Ltda. v. United States</u>, 271 F.3d 1367 (Fed. Cir. 2001), the decision in <u>Shelden</u> was limited to an <u>in personam</u> criminal forfeiture following the criminal conviction of a third party, in which an innocent owner-claimant sought to recover his interest in the forfeited property. It did not involve an <u>in rem</u> forfeiture directed against the property itself. <u>Shelden</u> and other cases involving claims of innocent third parties with respect to property that is subject to criminal <u>in personam</u> forfeitures, <u>see, e.g.</u>, <u>Froudi v. United States</u>, 22 Cl. Ct. 290 (1991), are not applicable to <u>in rem</u> seizures and forfeiture proceedings of the sort at issue in this case, involving alleged contraband or counterfeit goods. We need not address in this case whether the decision in <u>Shelden</u> is still valid in light of the subsequent decision of the Supreme Court in <u>Bennis v. Michigan</u>, <u>supra</u>.

the Rith Energy case, that concession makes clear that the true nature of Acadia's action is one for damages based on unlawful conduct by the government, not on a taking of private property for public use.

Acadia contends that if it cannot obtain compensation through a takings action for unreasonable delay in instituting forfeiture proceedings, it will have no remedy against governmental abuse in holding seized property indefinitely without either filing a judicial forfeiture action against the property or returning it to its owner. In fact, the courts have recognized a right not to have property held in such settings for an unreasonable time and have crafted a remedy to vindicate that right. Following the seizure of property, the owner of the property has a due process right to have the government either return the property or initiate forfeiture proceedings without unreasonable delay. See, e.g., United States v. Eight Thousand Eight Hundred & Fifty Dollars, 461 U.S. 555, 564-67 (1983) ("$8850"); Fuentes v. Shevin, 407 U.S. 67, 80 (1972); United States v. $7,990.00 in U.S. Currency, 170 F.3d 843, 846 (8th Cir. 1999); United States v. Premises Known as 608 Taylor Ave., 584 F.2d 1297, 1302-05 (3d Cir. 1978) ("[D]ue process . . . requires forfeiture proceedings against seized property be brought without unreasonable delay." (citing cases)); United States v. Ivers, 581 F.2d 1362, 1368 (9th Cir. 1978) ("Due Process requires that these proceedings be commenced with some promptitude."). In the case of such delay, the Supreme Court has held that a property owner has a remedy in a United States district court that has been recognized since the early nineteenth century:

> A claimant is able to trigger rapid filing of a forfeiture action if he desires it. First, the claimant can file an equitable action seeking an order compelling the filing of the forfeiture action or return of the seized property. See

> Slocum v. Mayberry, [15 U.S. (2 Wheat.) 1, 10 (1817)] (Marshall, C.J.). Less formally, the claimant could simply request that the Customs Service refer the matter to the United States Attorney. If the claimant believes that the initial seizure was improper, he could file a motion . . . for a return of the seized property.

$8,850, 461 U.S. at 569; see also United States v. Von Neumann, 474 U.S. 242, 244 n.3 (1986). By invoking that remedy, a property owner may force the government either to return the property or to initiate forfeiture proceedings. If the government commences forfeiture proceedings after an inordinate delay, the owner may file a motion with the court requesting dismissal of the proceeding and return of his property on the ground that the delay has violated his due process rights, even if the property would otherwise be forfeitable. See $7,990.00 in U.S. Currency, 170 F.3d at 846; United States v. One 1973 Buick Riviera Auto., 560 F.2d 897, 901 (8th Cir. 1977) (citing cases); United States v. One Motor Yacht Named Mercury, 527 F.2d 1112, 1114 (1st Cir. 1975). Such a due process violation may also give rise to a right to money damages against individual defendants in a court with jurisdiction to grant such a remedy. See Seguin v. Eide, 720 F.2d 1046, 1047-48 & n.2 (9th Cir. 1983); States Marine Lines, Inc. v. Shultz, 498 F.2d 1146, 1155-57 (4th Cir. 1974). A violation of due process rights, however, does not give rise to a claim for money damages against the United States in the Court of Federal Claims. See James v. Caldera, 159 F.3d 573, 581 (Fed. Cir. 1998); Crocker v. United States, 125 F.3d 1475, 1476 (Fed. Cir. 1997); LeBlanc v. United States, 50 F.3d 1025, 1028 (Fed. Cir. 1995).[2]

---

[2] The Supreme Court has suggested that an owner in Acadia's position might be able to bring a suit under the Tucker Act for money damages under a theory of breach of an implied-in-fact contract of bailment between the owner and Customs. See Kosak v. United States, 465 U.S. 848, 860 n.22 (1984). That theory, however, was not

In sum, we hold that the trial court correctly dismissed Acadia's complaint for failure to state a claim on which relief could be granted. While the Court of Federal Claims has jurisdiction to enter an award of damages for a violation of the Takings Clause of the Fifth Amendment, the court correctly held that Acadia's allegations did not give rise to a takings claim under the governing authorities.[3]

AFFIRMED.

---

asserted in this case, and we express no opinion as to whether the facts in Acadia's complaint might support such a claim.

[3] The government argues in the alternative that the trial court lacked jurisdiction over Acadia's takings claim, principally on the ground that Acadia's remedy was in the district court under the comprehensive statutory scheme for administrative and judicial review of forfeitures. See Vereda, 271 F.3d at 1374-75. A principal thrust of Acadia's takings claim, however, was that the government engaged in unreasonable delay before initiating forfeiture proceedings in this case and that the delay caused Acadia's loss. Because the statutory scheme for in rem forfeitures does not provide a means to address pre-forfeiture delay, the forfeiture statutes do not preempt the jurisdiction of the Court of Federal Claims over Acadia's takings claim. In this regard, we follow the court's analysis in Vereda, 271 F.3d at 1376, where the court explained that the takings claim in Shelden was not preempted because, under circumstances such as those in Shelden and in this case, the civil forfeiture statutes did not provide the plaintiff with "specific and comprehensive scheme for administrative and judicial review" of its claim of a violation of its rights in the subject property.